THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Sandra Poston,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Florence School District One,<br><br>　　　　　Defendant. | Civil Action No.: 4:25-cv-13259-SAL-TER<br><br><br>**COMPLAINT**<br><br>**(JURY TRIAL REQUESTED)** |

Now comes Plaintiff, Sandra Poston, and complains as follows:

### PARTIES AND JURISDICTION

1. At all relevant times, Plaintiff was a citizen and resident of the County of Florence, South Carolina, within the Florence Division of the United States District Court for the District of South Carolina (hereinafter "this District and Division").
2. At all relevant times, Florence School District One (a/k/a Florence 1 Schools)(hereinafter "Defendant" or "Florence 1") was a school district located in the County of Florence, South Carolina, and was a subdivision of the State of South Carolina government.
3. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 42 U.S.C. §2000(e) ("Title VII"), 42 U.S.C § 1981, and 42 U.S.C. § 1983.
4. This Court has supplemental jurisdiction over state claims of defamation pursuant to U.S.C. §1367(a).
5. Venue for all causes of action set forth herein lies in this District and Division, pursuant to 28 U.S.C. §1391(b), in that Plaintiff resided in this District and Division, at all relevant times, Florence 1 is located in this District and Division, and that all events giving rise to Plaintiff's claims occurred in this District and Division.
6. On information and belief, as a subdivision of state government, Defendant is subject to 42 U.S.C. 2000(e) (Title VII).
7. Defendant and its employees, officers, directors, and trustees are subject to 42 U.S.C. § 1981.
8. Plaintiff timely filed her complaint of sex discrimination with the South Carolina Human Affairs Commission ("SCHAC"), and with the U.S. Equal

      Opportunity Commission ("EEOC"), alleging discrimination on the basis of sex.

9. Plaintiff received from the EEOC a Notice of Right to Sue on August 6, 2025.
10. Plaintiff timely filed the foregoing action within ninety (90) days of the date on which she received the Notice of Right to Sue described above.
11. Plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral, and all other jurisdictional requirements necessary for the maintenance of this action.

## FACTUAL ALLEGATIONS

12. Plaintiff is a Caucasian female over the age of 40.
13. Prior to the termination of her employment, Plaintiff was working as a teaching assistant at Royall Elementary School (hereinafter "Royall Elementary"), where she had been employed for 20 years.
14. On July 31, 2024, the day before students returned for the new school year, Plaintiff participated in a compulsory employee team-building exercise organized by Royall Elementary Principal Julie Smith (hereinafter "Smith"), a white female, and Assistant Principal Marci Gatewood (hereinafter "Gatewood"), a white female.
15. Smith appointed teams to represent countries competing in the Olympics.
16. Each team was to have a table with clothing, decorations and food representative of their country's culture and traditions.
17. Each team was to provide an activity.
18. The team to which Plaintiff was assigned was to represent Mexico.
19. Plaintiff's teammates were:
    a. Rodriguez Green, a Black, male, at-will custodian;
    b. Carley Chapman, a white, female, at-will teaching assistant;
    c. Marianne Gaskins, a white, female, continuing contract teacher;
    d. Bridgett Kennedy, a white, female, continuing contract teacher;
    e. Jordan Oswalt, a white, female, at-will teaching assistant;
    f. Tonya McGowan, a white, female, at-will teaching assistant, and
    g. Sandy Lee, a white, female, at-will teaching assistant;
20. The team decorated its table with Mexican clothing and trinkets, as well as foods, associated with Mexican culture.
21. For the activity, team member Marianne Gaskins, a continuing contract teacher, proposed the idea of a game of "red light/green light," with the border between Mexico and the United States as the finish line. Contemporaneous email from Gaskins reflects that she had ideas for a game.
22. On a signal, participants ran from a fixed point to the "border," where the winner was awarded a prize.
23. The activity was approved and adopted by the entire team. The team decided to have "U.S. Border Patrol" agents at the finish line.
24. As other members of the team had been given other assignments, Plaintiff and Rodriguez Green agreed to play those roles. Plaintiff purchased blank t-shirts,

and another team member had them printed with the words "U.S. Border Patrol."
25. Principal Smith and Assistant Principal Gatewood were aware, before the event, of the activity and of the U.S. Border Patrol t-shirts.
26. Every aspect of the team's presentation was supported by consensus and approved by Smith and Gatewood. Every member of the team understood that Plaintiff and Green would be wearing the U.S. Border Patrol shirts.
27. Plaintiff had no intent to offend any person, ethnic group, or anyone from a particular nation.
28. Plaintiff never interacted with anyone who seemed to be offended.
29. Plaintiff was not aware of any complaints or objections from anyone present at the events of the day.
30. Photos were taken of Plaintiff and Green wearing the t-shirts, and the photos were posted on Facebook. There were also one or more group photos posted.
31. There was some negative reaction in the community.
32. After minimal investigation, which did not include interviews with all team members, Plaintiff and Green were fired on August 1, 2024. On information and belief, Carley Chapman was fired because she was the appointed team leader.
33. Of the seven team members, two were continuing contract teachers, entitled to due process hearings if terminated. The other five members of the team were at-will employees.
34. Of the seven members of the team, these three at-will employees were the only employees that were fired. As noted, Smith and Gatewood were forced to resign.
35. On information and belief, neither Green nor Chapman appealed the terminations of their employment.
36. Plaintiff appealed to Superintendent O'Malley the termination of her employment. O'Malley denied the appeal on the false grounds that Plaintiff had not been truthful during the course of the investigation.
37. Plaintiff appealed O'Malley's decision to the District Board of Trustees (hereinafter "the Board"), which upheld O'Malley's decision.
38. Subsequently, the District reinstated Green, an African American male, who engaged in exactly the same conduct as did Plaintiff.
39. Alleging sex discrimination, Plaintiff filed a complaint with SCHAC, which referred the complaint to the EEOC.
40. In its Position Statement to the EEOC, Defendant made no mention of its prior, false assertion that Plaintiff had not been truthful in the investigation. Instead, Defendant asserted, for the first time, that Green had a learning disability and did not understand the meaning of the activity.
41. The EEOC made no finding, and dismissed the case.
42. Following the termination of her employment, Plaintiff doggedly, but unsuccessfully, pursued employment elsewhere, submitting numerous

applications and resumes for a wide variety of positions. She has suffered lost income and benefits, emotional distress, and other damages.

FOR A FIRST CAUSE OF ACTION:<br>(Violation Of Title VII<br>Discrimination Based On Sex)

43. Plaintiff hereby realleges, verbatim, each and every allegation of the forgoing paragraphs as if fully set forth herein.
44. Plaintiff, as a Caucasian female, is a member of a protected class under Title VII.
45. Throughout her employment, Plaintiff performed her job to the satisfaction of Defendant.
46. Plaintiff and comparator Green engaged in precisely the same conduct that led to termination.
47. Plaintiff and Green both participated in the team activity.
48. Plaintiff and Green wore identical t-shirts bearing the words, "U.S. Border Patrol."
49. Plaintiff and Green appeared together in the photograph that was distributed in print and electronic media.
50. The sole relevant differences between these two similarly situated individuals are gender and race.
51. Of the five individuals fired or forced out their jobs in relation to this matter, including Smith and Gatewood, only one was male, and he is the only one who was reinstated.
52. Defendant engaged in illegal discrimination in firing and refusing to reinstate Plaintiff.
53. Plaintiff has suffered lost past and future wages, mental distress, humiliation, loss of reputation in the community, and other damages.

FOR A SECOND CAUSE OF ACTION:<br>(Defamation *Per Se*)

54. Plaintiff hereby realleges, verbatim, each and every allegation of the forgoing paragraphs as if fully set forth herein.
55. Following the team-building exercise on July 31, 2024, there was substantial controversy in the community, which was communicated at school board meetings, news media, and social media.
56. Plaintiff was surprised that some viewed the game as offensive.
57. Plaintiff and Green had the bad luck to be chosen to wear the U.S. Border Patrol t-shirts, and the photograph of them wearing the t-shirts became the visual image most closely related to the story.

58. Although other photos of team members were circulated, no photo clearly identified the individuals as did the one of Plaintiff and Green. Their association with the event and the fact that they had been fired became well known.
59. Plaintiff and Green became the faces of the story.
60. In an August 2, 2024, letter addressed to the "Florence 1 Schools community," Superintendent O'Malley addressed what he called the "inexcusable public Facebook post," depicting the event.
61. O'Malley wrote, "We do not tolerate hate or racism of any kind within our community. I am disgusted and disappointed by the content of this post, especially one made by an educator."
62. In a second letter, the following week, addressed to Royall Parents and Guardians, O'Malley wrote that he was "disappointed and humiliated." He wrote "we will not tolerate such ignorance in our schools."
63. In an article in the Pee Dee edition of the Charleston Post and Courier, O'Malley is quoted as saying, "My issue is, someone has to be accountable for this." He stated that the District terminated two classroom assistants (Plaintiff and Chapman) and one custodian (Green).
64. The article went on to say "[i]n their decision to terminate employees, they cited board policies that detail district protocols for racial harassment, staff conduct, and disciplinary action."
65. Articles about the incident were published in news outlets and social media around the world including Fox News, Newsweek, USA Today, The Daily Mail (UK), Yahoo News (U.K.), as well as in newspapers across the state, and the incident was referenced on social media platforms such as Facebook, TikTok, Reddit, YouTube, and others.
66. These stories quoted O'Malley's statements.
67. Taken together, O'Malley's statements and his actions blamed Plaintiff, Green (whom he later exonerated) and Chapman for what O'Malley characterized as inexcusable racial harassment, motivated by hate, racism, ignorance, and an insensitive disregard for the challenges faced by the Hispanic community.
68. In his letters, O'Malley described himself as "humiliated," "disgusted," and "disappointed."
69. Having been singled out for termination, Plaintiff, and only two other members of the team of seven, were portrayed by O'Malley as the authors and perpetrators of a hateful, racist activity.
70. No blame was assigned to the other five members of the team, who were equal participants, three of whom were certified, continuing contract teachers.
71. In all respects, O'Malley was acting within the scope of his employment, but his statements were not protected under any privilege.
72. The statements O'Malley made about Plaintiff amounted to character assassination and they were false and defamatory.
73. These statements and actions by O'Malley constituted defamation *per se* because their defamatory meanings were obvious on their face.

74. Plaintiff was clearly identified as a subject of these statements.
75. O'Malley's statements were wrongful and made with the intention of hurting Plaintiff.
76. O'Malley exhibited a reckless disregard for the truth or falsity of his statements, in particular, by failing to conduct a competent investigation, and by acting rashly.
77. O'Malley's statements were actionable *per se* because, among other things, they characterized Plaintiff as unfit for her profession in education.
78. O'Malley's comments were actionable *per se* because they constituted libel, as they were widely distributed in his letters and perhaps other written statements, and in statements quoted by news reporters and others, which he should have assumed would appear in print media, television programs, and/or online.
79. As a result of O'Malley's statements and conduct, Plaintiff's reputation in the community and elsewhere was devastated, and her career in education was ended.
80. Despite her many efforts, Plaintiff was unable to find work, and, finally, had to initiate Social Security benefits early to generate some kind of income.
81. As a result of doing so before reaching full eligibility, she is receiving a reduced Social Security benefit, and future income may cause a reduction in benefits.
82. Plaintiff lost the opportunity for retirement benefits as a state employee.
83. Plaintiff lost all other benefits from her employment with Defendant, particularly health insurance, on which she and her husband relied.
84. The defamatory statements have caused injury to Plaintiff's standing among her peers, and have damaged her social relationships such that she has been shunned by others who were formerly warm and involved in her life.
85. Plaintiff has suffered immense mental distress, anxiety, depression, and countless sleepless nights, as well as other damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands and prays:
a) For a trial by jury, and judgement against Defendant:
b) For such sums as actual and other compensatory damages, in an amount as a jury may determine;
c) For exemplary and punitive damages against Defendant, in an amount as a jury may determine, to halt such conduct, and to deter repetition of such conduct;
d) For the costs of this action, and attorney's fees, and
e) For such other and further relief to which Plaintiff may be entitled, including such relief this Honorable Court deems just and proper to award.

SIGNATURE PAGE FOLLOWS

RESPECTFULLY SUBMITTED

s/John F. Emerson

John F. Emerson (D.S.C Bar # 05900jfe)
EMERSON LAW, LLC
460 King Street, Ste 200
Charleston SC 29403
843/929-0606
john@johnemersonlaw.com

Date of signing: November 3, 2025